# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

COREY HOLLENBECK,

                                  Plaintiff,

      v.                                        5:12-CV-1240
                                                      (NAM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

LAWRENCE D. HASSELER, ESQ., for Plaintiff
KRISTINA COHN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On September 7, 2007, plaintiff applied for Supplemental Security Income ("SSI") Benefits, alleging disability beginning August 20, 2007. (Administrative Transcript ("T.") at 94-100). Plaintiff's claim was denied initially on December 14, 2007. (T. 57). Plaintiff requested a hearing, which was held on November 5, 2009 before Administrative Law Judge ("ALJ") Elizabeth Koennnecke, and at which plaintiff testified. (T. 21-54). ALJ Koennecke issued a decision denying benefits on March 15, 2010, which became the final decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on November 20, 2010. (T. 9-20, 1-5).

Plaintiff filed an action in the Northern District of New York, challenging the Commissioner's November 20, 2010 decision. *Hollenbeck v. Commissioner of Social Security*, 7:10-CV-1454 (DNH/DEP). On May 10, 2011, the parties stipulated to a reversal and remand of plaintiff's case for further evaluation. (Dkt. Nos. 15-17 of 7:10-CV-1454). On August 4, 2011, the AC issued a detailed order, remanding the matter to ALJ Koennecke, who held another hearing on February 8, 2012, at which plaintiff and a vocational expert ("VE") testified. (T. 620-22 (AC Order), 567-95 (new hearing)). ALJ Koennecke issued another unfavorable decision on March 1, 2012 (T. 541-58), which became the final decision of the Commissioner when the AC denied plaintiff's request for review on July 19, 2012. (T. 529-32).

While the judicial review of plaintiff's initial application was still pending, on December 22, 2010, plaintiff filed a new application for SSI benefits, which was ultimately granted, with a disability onset date of March 16, 2010, the date immediately following ALJ Koennecke's most recent unfavorable decision. (T. 542).[1] Thus, this appeal is for a closed period of disability from August 23, 2007 until March 15, 2010. (*Id.*)

## II.    ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.    The Commissioner failed to properly assess the severity of plaintiff's asthma. (Pl.'s Br. at 11-13).

2.    The Commissioner erroneously failed to find that the severity of

---

[1] The citation to the record is to ALJ Koennecke's March 1, 2012 unfavorable decision. (T. 542). The ALJ explains that during the pendency of the appeals in plaintiff's case, he filed a new application that was granted. The new application is not part of this record, but it is apparent that ALJ Koennecke was aware of the favorable decision.

plaintiff's joint and spine impairments rise to the level of Listed Impairments. (Pl.'s Br. at 13-17).

3.   The Commissioner failed to properly review and weigh the medical evidence. (Pl.'s Br. at 17-20).

4.   The Commissioner failed to properly apply the "special technique" when evaluating plaintiff's mental impairments. (Pl.'s Br. at 20-22).

5.   The Commissioner failed to properly determine plaintiff's Residual Functional Capacity ("RFC"). (Pl.'s Br. at 22-24).

6.   The Commissioner's decision that there is significant work that plaintiff can perform is not supported by substantial evidence. (Pl.'s Br. at 24-25).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed, dismissing the complaint in its entirety. For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III.   **APPLICABLE LAW**

### A.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering

3

his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and

4

the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).   However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## IV. FACTS

Both plaintiff and defendant have included detailed statements of fact in their briefs. (Dkt. No. 11 (plaintiff); Dkt. No. 14 (defendant)). Although there are some differences in the focus of the factual statements,[2] the court will adopt the facts as stated by both parties as well as the facts stated by the ALJ in her decision, with any exceptions as noted in the court's discussion of the issues.

## V. APPEALS COUNCIL'S ORDER

The AC issued a detailed remand order in plaintiff's case. (T. 618-22). The following requirements for the ALJ were included in the AC's order:

(1)  Assess evidence of plaintiff's hip impairment; environmental limitations associated with plaintiff's asthma; and mental impairment, based upon Dr. William Kimball's January and February 2008 evaluation of plaintiff's mental functioning.

(2)  Determine "listing level severity" under Listing 1.04(A).

(3)  Obtain additional evidence from treating physician, Dr. Howard Huang concerning plaintiff's functional capacity.

(4)  Reassess the plaintiff's RFC, particularly with respect to Dr. Michael Camillo's assessed mental function limitations.

(T. 621-22). The AC also ordered that, in compliance with the above requirements, the ALJ should offer the plaintiff an opportunity for a new hearing,[3] take any further action to complete the administrative record, and issue a new decision. (T. 622).

---

[2] Plaintiff's counsel has included facts relating to the time period after plaintiff was found disabled, and defendant states that the Government is focusing on "Medical Evidence *During* the Relevant Period (August 23, 2007 through March 15, 2010)." (Pl.'s Br. at 7-8; Def.'s Br. at 1).

[3] As stated above, the ALJ held a new hearing on February 8, 2012. (T. 567-95).

# VI.  ALJ's DECISION

After discussing the procedural history of this case, ALJ Koennecke stated that, in accordance with the remand order, and prior to the new hearing, she directed that plaintiff's representative submit all updated medical – and other – evidence, particularly from treating physician Dr. Huang, who would have opined regarding the limitations that were attributable to "the left hip, asthma, and back impairment." (T. 541-42).  The ALJ also requested that plaintiff's counsel inform the ALJ if counsel were not planning on submitting further evidence, so that the Hearing Office could assist in the development of the record. (T. 542).

Plaintiff's counsel contacted Dr. Huang, who did not provide any clarification or new assessment.  No additional RFC evaluations were provided from any other source that were relevant to the time period at issue.  At the hearing, all the existing exhibits were admitted; however, the plaintiff's counsel objected to the admission of the narrative consultative examination and form-RFC evaluation of Dr. Brij Sinha, M.D. because Dr. Sinha had subsequently surrendered his medical license. (T. 542). The ALJ did not exclude the evidence from the record, but stated that she took plaintiff's objection into account when assessing the weight to be given to the reports. (*Id.*)

Substantively, the ALJ found that from August 23, 2007 until March 15, 2010, plaintiff's lumbar stenosis with radiculopathy, osteoarthritis of the left hip, and mood disorder were "severe" impairments. (T. 545).  The ALJ also found that plaintiff's cardiac impairment, his asthma or COPD, his hypertension, and hyperlipidemia were

not severe impairments because they were controlled with medication, remained stable, and did not impose more than minimal limitation of function. (T. 547). In addition, the ALJ noted that notwithstanding alleged breathing problems, and several doctors telling him to stop smoking, the plaintiff continued to smoke cigarettes and occasionally marijuana. (T. 547-48). In light of this conduct, the ALJ found that plaintiff did not have a severe respiratory disorder. (T. 548). The ALJ also found that plaintiff's 2005 right foot pain, 2009 hernia, and his 2010 hand cyst were not severe because there were no functional limitations caused by these impairments. The ALJ also found that plaintiff did not suffer the hand impairment until after the relevant closed period. (T. 548).

At the third step of the disability analysis, in accordance with the remand order, the ALJ considered whether plaintiff's impairments met or equaled the severity of listed impairments. In addition to considering whether plaintiff's spinal impairment met Listing 1.04(A) as directed by the AC, the ALJ considered whether the severity of plaintiff's hip impairment met Listing 1.02(A). (T. 548-49). The ALJ also considered whether the severity of plaintiff's mental impairments rose to Listing level, considering both Listing 12.04 (affective disorders) and Listing 12.06 (anxiety-related disorders).

Finding that none of plaintiff's impairments met the severity of the relevant listings, the ALJ determined that during the closed period in question, August 23, 2007 until March 15, 2010, plaintiff had the RFC to perform a wide range of light work, including the ability to lift and/or carry, push and/or pull 20 pounds

occasionally and 10 pounds frequently; sit without restrictions; stand and/or walk at least two hours in an 8-hour day. (T. 549). The ALJ determined that plaintiff did not have any postural, manipulative, communicative, or environmental limitations, except that he could only climb, stand, stoop, and bend occasionally. (*Id.*) Finally, the ALJ determined that plaintiff retained the mental ability on a sustained basis to frequently understand, carry out, and remember simple instructions; to frequently respond appropriately to supervision, co-workers, and usual work situations; and to frequently deal with changes in a routine work setting. (*Id.*)

In making this determination, the ALJ discussed Dr. Sinha's opinion, while recognizing that plaintiff objected to its admission. (T. 550). The ALJ rejected the part of Dr. Sinha's report, in which he found that plaintiff would have to avoid environmental irritants, because plaintiff continued to smoke both cigarettes and marijuana, which showed that he was able to handle extreme exposure to respiratory irritants without significantly exacerbating his asthma. (*Id.*)

As directed by the AC, the ALJ discussed Dr. Huang's findings. (T. 550-51). In the ALJ's initial decision, she gave less weight to Dr. Huang's RFC determination because in his September 16, 2009 treatment notes, he stated that the plaintiff's "disability paperwork was a gross estimate based upon plaintiff's history." (T. 550) (citing T. 464). When plaintiff's counsel requested a clarification from Dr. Huang, the doctor stated that he "deferred to a functional capacity evaluation with regard to the claimant's ability to work." (T. 550) (citing T. 516). Based on this equivocal statement, the ALJ reviewed Dr. Huang's contemporaneous treatment notes and

determined that Dr. Huang's restrictive RFC was not supported by the treatment notes and appeared to have been based solely upon plaintiff's subjective complaints. Thus, the ALJ continued to give Dr. Huang's RFC evaluation limited weight. (T. 551).

The ALJ then considered the opinions of various other physicians, including consulting physician Dr. Charles Moehs, who stated that the plaintiff could essentially perform the functions of light work, Dr. Ara Madonian, who advised that plaintiff should avoid lifting heavy objects or "shoveling" because of his hernia; and a psychologist, stating in October 2009, that plaintiff should avoid work that requires "heavy lifting." (T. 551). The ALJ gave limited weight to medical opinions that were rendered prior to plaintiff's alleged onset date because they had limited probative value as to his functioning since August 2007.[4] (T. 552).

With respect to plaintiff's mental limitations, the ALJ discussed the November, 2007 opinion by consultant Dr. Jeanne Shapiro and the December, 2007 opinion of non-examining, State Agency medical consultant, Dr. Apacible. (T. 552). The ALJ gave great weight to Dr. Shapiro's RFC, which stated that plaintiff could perform many functions associated with the mental demands of work, including understanding and following simple instructions and performing simple and complex tasks, both with supervision and independently. (T. 552). Dr. Shapiro found that plaintiff could maintain attention and concentration, make appropriate decisions, relate to and interact with others, and deal with some stress. (*Id.*) The ALJ assigned some weight to

---

[4] The transcript contains medical records dating back to 2002, but plaintiff is alleging onset beginning August of 2007. (T. 176-268).

Dr. Apacible's opinion only because it was consistent with that of Dr. Shapiro.

In accordance with the AC's order, the ALJ considered treating psychiatrist, Dr. Camillo's opinion of plaintiff's mental RFC. (T. 552). The ALJ gave Dr. Camillo's opinion "the greatest weight" because he was the treating psychiatrist. Although Dr. Camillo stated that plaintiff had some areas of "moderate difficulty," the ALJ pointed out that many areas were only "mildly limited." The ALJ's interpretation of "moderate" limitation was that "while the claimant has some difficulties with complex work, he does retain the ability to frequently meet the demands of basic mental work." (*Id.*)

The AC also directed that the ALJ reconsider the opinion of Dr. William Kimball, Ph.D. (T. 553). The ALJ found that although Dr. Kimball assessed plaintiff's Global Assessment of Functioning ("GAF")[5] Score at 45 and 42 in 2008, plaintiff's contemporaneous mental examinations and his activities were inconsistent with the low level of functioning represented by these scores. (T. 553). In addition, the ALJ cited mental health records from Mercy Center, from April of 2010, finding that plaintiff's GAF was 55, which is defined as "moderate" limitations, showing that the "lower GAF scores were only a short-term trend." (*Id.*) The ALJ stated that she did not consider medical source statements provided after March 15, 2010 because they were rendered after the time that plaintiff was found disabled.

---

[5] The GAF is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) (DSM-IV-TR).

The ALJ found that plaintiff was not credible to the extent that he claimed greater physical and mental restrictions than found by the ALJ. (T. 553-54). The ALJ noted that although a State Agency medical consultant found that the medical evidence showed a worsening of plaintiff's musculoskeletal symptoms after March 15, 2010, the treatment notes prior to that date do not show sufficient clinical findings to support a finding of disability. With respect to his mental limitations, the ALJ stated that plaintiff's counseling records lacked "abnormal objective findings." (T. 555). In February of 2010, plaintiff denied any symptoms associated with depression or anxiety, and he maintained a broad range of daily activities. (*Id.*) In March 2010, plaintiff stated that he did "odd jobs," and by April 2010, he stated that he was helping his landlord around the apartment building. (T. 555-56).

The ALJ discounted plaintiff's credibility based on evidence of some criminal activity in his background and his poor work history, detracting from his "motivation to work." (T. 556). Plaintiff stopped working in 2006 because he was fired from his position, not because of any health problems, and because of plaintiff's poor work history, he had no "past relevant work." The ALJ concluded that, during the period in question, plaintiff was "limited," but not disabled, by his symptoms. (*Id.*)

At the final step of the disability analysis, the ALJ used the Medical Vocational Guidelines[6] as a framework and considered the testimony of a vocational expert in determining that, based upon plaintiff's age, education, RFC for some categories of light and sedentary work, and prior work experience, plaintiff was capable of making

---

[6] 20 C.F.R. Pt. 404, Subpt. P, App.2.

a successful adjustment to other substantial gainful work in the national economy. (T. 557).

## VII.  **DISCUSSION**

### A.  **Severe Impairments**

#### 1.  **Legal Standards**

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis.  *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step 2 if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404. 1521(b).  It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act."

*Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3). The Second Circuit has held that the Step 2 analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps 3 through Step 5 must be undertaken. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step 2 may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

## 2. Application

Plaintiff alleges that the ALJ erred in determining that plaintiff's asthma was not severe. However, the ALJ did not deny plaintiff's claim because his asthma was

not severe. The ALJ found several other severe impairments and continued through the disability analysis, ultimately considering the combination of all of plaintiff's impairments, including the asthma. Thus, even if the ALJ erred in determining that plaintiff's asthma were not severe, it was harmless error and not a reason to reverse the ALJ's decision.

In any event, the ALJ did not err in making the severity determination with respect to plaintiff's asthma. Plaintiff cites the fact that he contracted pneumonia in November of 2010, and he was "additionally diagnosed with chronic obstructive pulmonary disease." (Pl.'s Br. at 12). November 2010 is long past the relevant period for which the ALJ was tasked with assessing. Thus, the fact that plaintiff's condition worsened after his onset date is not relevant to the determination regarding the closed period in this case.

Plaintiff then relies upon the examination of Dr. Sinha for the argument that plaintiff should avoid environmental irritants. (*Id.*) Plaintiff takes inconsistent positions, arguing that the ALJ should have excluded Dr. Sinha's report completely, while at the same time arguing that the report supports plaintiff's claim. Plaintiff's claim that the ALJ should not have picked portions of Dr. Sinha's report while ignoring others, does not save plaintiff's argument.

Plaintiff also relies upon a July 11, 2007[7] report from the New York Heart Center, at the time that plaintiff was being evaluated for his cardiomyopathy, written

---

[7] This report is dated more than one month prior to plaintiff's alleged onset date of August 23, 2007 and is the only report that discusses plaintiff's shortness of breath.

by Dr. Ziad El-Khally, M.D. (T. 272). Dr. El-Khally stated that plaintiff was experiencing shortness of breath with "moderate exertion." (T. 272). However, the doctor was evaluating plaintiff's cardiac impairment, not his asthma, and he noted that plaintiff was still smoking. In the same report, plaintiff denied respiratory problems such as cough, snoring, or wheezing. Dr. El-Khally found that plaintiff's lungs were clear to ascultation with equal air entry. Plaintiff's respirations were even without use of accessory muscles and no intercostal retractions were noted. Breathing was not labored, diaphragmatic, or abdominal. (T. 272). Dr. El-Khally advised plaintiff to stop smoking. (T. 273).

As the ALJ stated in her opinion, other physical examinations of plaintiff during the relevant period show that his lungs were clear and that his asthma was under control with medication. (T. 547, 180, 183, 184, 185, 354, 437, 438, 442-43, 772). In December of 2008, treating physician, Dr. Glenn Thibault reported that plaintiff had normal breath and voice sounds, no wheezing, rhonchi or rales or crackles were heard. (T. 438). On September 25, 2008, the doctor noted that plaintiff had asthma of "unspecified type," but "without status asthmaticus."[8] (T. 442). On January 15, 2009, when he was being examined for his hernia problem, he reported no respiratory symptoms, and upon objective evaluation, Dr. Madonian found that plaintiff's respirations were normal, and his lungs were clear to ascultation. (T. 771-72).

On February 16, 2010, Dr. Thibault stated that plaintiff's breathing was "doing

---

[8] Status asthmaticus is an older term that implies "severity." http://www.ncbi.nlm.nih.gov/pubmed/4083236.

fine on current meds – rarely uses albuterol." (T. 822). Plaintiff's examination on February 16 showed normal breath sounds, no wheezing, rhonchi or rales or crackles were heard. (T. 824). Dr. Thibault's assessment was "Asthma – controlled." (*Id.*) On March 26, 2010, Dr. Potter stated that plaintiff's oxygen saturation was 99%. (T. 785). Finally, the fact that plaintiff continued to smoke shows that the exposure to environmental irritants such as cigarette smoke did not affect his abilities. Based on all the evidence above, the ALJ's finding that plaintiff's asthma was not severe was supported by substantial evidence.

## B. Listed Impairments

### 1. Legal Standard

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920. It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments. *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) *citing Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

### 2. Application

Plaintiff argues that the ALJ erred in determining that plaintiff's hip impairment

failed to meet the severity of Listing 1.02(A) (Major Disfunction of a Joint) and that plaintiff's back impairment failed to meet the severity of Listing 1.04(A) (Disorders of the Spine). The court finds that the ALJ's determination was supported by substantial evidence for the closed period in question.

### a.    Listing 1.02(A) (Hip)

Plaintiff argues that his hip impairment meets the severity of a listed impairment. Plaintiff focuses his argument on the fact that although his hip impairment was not objectively diagnosed by MRI until November of 2009, the condition existed prior to March of 2010. Plaintiff then points to various symptoms that were caused by his hip impairment, states the requirements of the listing, and argues that he has met all these requirements.

Listing 1.02(A) requires that the joint's disfunction be characterized by gross anatomical deformity, such as subluxation, contracture, bony or fibrous ankylosis, or instability. 20 C.F.R. Pt. 404, Subpt. P, App.1 § 1.02 ("Listing of Impairments"). The impairment must cause joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint(s) with:

> A.    Involvement of one major peripheral weight-bearing joint (*i.e.* hip, knee, or ankle), ***resulting in inability to ambulate effectively, as defined in 1.00B2b.***

*Id.* § 1.02(A) (emphasis added). Section 1.00(B)(2)(b) defines the ability to ambulate effectively as the ability to sustain a reasonable walking pace over a sufficient

distance to be able to carry out activities of daily living and have the ability to travel without companion assistance to and from a place of employment or school. Examples of ineffective ambulation include the inability to walk without the use of a walker, two crutches or two canes, the inability to walk one block at a reasonable pace on rough or uneven surfaces, the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps without a handrail. The ability to walk around one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation. *Id.*

While plaintiff in this case has a medically determinable impairment of the hip,[9] there are no medical records indicating that plaintiff ever lost the ability to ambulate effectively during the relevant time period. On August 20, 2007, plaintiff had some tingling in his legs, but his gait was normal, and he could heel-toe walk with no difficulty. (T. 302). The issue being addressed by the examining physician assistant at that time was the plaintiff's back, not his hips. On September 17, 2007, plaintiff had a normal gait, and was able to heel and toe walk without difficulty. (T. 303). Deep tendon reflexes were 2+ at the knees and ankles, and his lower extremities were distally neurovascularly intact. (*Id.*)

There was no mention of hip pain in January of 2008, in May of 2008, in December of 2008, or in March of 2009 when plaintiff was being examined for his

---

[9] On November 24, 2009, an MRI of plaintiff's hip suggested femoroacetabular impingement biomechanics with secondary femoral head spurring, bilaterally. The left hip images demonstrated a suble anterosuperior tear with fraying of the carilaginous labrum and two interarticular loose bodies posteriorly in the joint. (T. 471).

back. (T. 354, 356, 362, 439). Plaintiff's gait and station were normal. (*Id.*)

Plaintiff's gait was normal in July of 2009 and September 16, 2009. (T. 363, 464). On

July 24, 2009, Dr. Huang found that plaintiff experienced a locking and a popping in

the left greater trochanter area, with a burning quality, exacerbated by standing. (T.

363). On October 29, 2009, Dr. Huang found that plaintiff's left hip internal rotation

causes some lateral greater trochanter region pain. (T. 465). Left hip external rotation

was without significant pain, and both internal and external rotation had full passive

range of motion. (*Id.*)

When plaintiff was examined consultatively by Dr. Moehs on September 24,

2009, plaintiff had popping and discomfort in his left hip with lateral rotation. The

right hip was normal. Plaintiff told Dr. Moehs that he did not drive, but could walk

one half mile, do his own grocery shopping, climb stairs, and help with the housework

and cooking. (T. 509). The listing requires that he be unable to perform these

activities. Plaintiff's own statements about his activities contravene a finding that he

met Listing 1.02. On February 16, 2010, plaintiff reported to Dr. Thibault that he was

"exercising regularly." (T. 822). On December 28, 2010 (even after the onset of

disability), the examining doctor from North Country Surgical Specialists stated that

plaintiff walked with a normal gait. (T. 930).

Although there are references to plaintiff "limping" (T. 309, 339, 348), and at

least one reference to a "guarded" gait (T. 351), this does not demonstrate an inability

to ambulate effectively as defined in the listing. Plaintiff came to his second hearing

using a cane and testified that the cane was "prescribed" by Dr. Huang. (T. 576).

There is no medical record from Dr. Huang in the transcript, during the period at issue in this case, in which he states that he has prescribed "a cane" for plaintiff.[10]  On December 23, 2009, Dr. Baird reported that plaintiff "ambulates without assistive devices." (T. 519).

In any event, even if plaintiff used a cane, the definition of an inability to ambulate effectively requires an "extreme" limitation of the ability to ambulate. Listing of Impairments § 1.00(B)(2)(b).  An "extreme" limitation requires the plaintiff to have

> insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand held assistive device(s) that limits the functioning of ***both upper extremities*** . . . .

Plaintiff's use of a cane would interfere with only one of his upper extremities and would not qualify under the definition.

While the records support a finding plaintiff had pain and restriction of movement in his hip, there is no evidence that he lost the ability to ambulate effectively, as defined in the regulations, during the period in question.  Thus, plaintiff's hip impairment did not rise to listing severity because he did not exhibit all the components of the listing requirements.

### b.    Listing 1.04(A) (Spine)

Plaintiff also argues that his spinal impairment meets the severity of Listing

---

[10] The Listing requires that the medical basis for the assistive device be "documented." Listing of Impairments § 1.00(J)(4).

1.04(A).  This section of the Listings requires that the plaintiff have a disorder of the

spine, resulting in the compromise of a nerve root or the spinal cord, with

> A.    Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of
> the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine);
> . . .

Listing 1.04(A).

The ALJ found that plaintiff's spinal impairment did not meet the severity of a

listed impairment because the record did not contain "consistent" findings of sensory

loss, motor weakness, reflex abnormalities and positive straight leg raising test. (T.

548).  There is no question that plaintiff has a spinal impairment with radiculopathy.

Plaintiff cites to various pages in the record in which he argues that evidence of the

requisite muscle weakness and sensory or reflex loss appears. (Pl.'s Br. at 17).  He

also states that a December 23, 2009 examination by Dr. Bruce Baird[11] showed

diminishes reflexes in plaintiff's knee and trace reflexes in both ankles. (*Id.*)

In order to qualify for listing severity, the plaintiff must show that he meets all

the requirements of the listing consistently. *See Evans v. Astrue*, No. 12-CV-6002,

2012 WL 6204219, at *3-4 (W.D.N.Y. Dec. 12, 2012) (declining to find listing

severity because the required clinical findings were never "consistent").  While some

of Dr. Huang's reports found that plaintiff had some sensory loss and some muscle

---

[11] Dr. Baird is also a treating physician with Dr. Huang and Dr. Thibault from North Country
Orthopaedic Group.

weakness, plaintiff did not exhibit all the symptoms of the listed impairment at the same time, and Dr. Thibault's reports never indicate any of the additional symptoms required by the listing, such as strength, motor, or sensory disturbances.

On January 24, 2008, although Dr. Huang reported that plaintiff's sensation in was decreased, he also stated that plaintiff's reflexes were 2+ bilaterally. (T. 354). Dr. Huang makes an unclear statement that plaintiff's "[m]usculoskeletal, gait and station and inspection and assessment of stability of the lumbar spine and bilateral lower extremities are similar." Dr. Huang stated that plaintiff had weakness on the left side, but there is no indication that he had atrophy or motor loss.[12] On March 28, 2008, Dr. Huang reported negative straight leg raising bilaterally even though other tests produced pain. (T. 355). He reported "decent knee extension, ankle dorsiflexion, [and] ankle plantar flexion range bilaterally." He also stated that manual muscle testing of selected muscles representing each of bilateral L2-S1 myotomes reveal probably 5/5 except for not very strong with bilateral great toe dorsiflexion maybe weaker on the left. (T. 355). There is no mention of motor loss.

In addition, Dr. Thibault reported that plaintiff had no muscle aches, no localized joint pain, no joint stiffness, deep tendon reflexes were normal, gait and stance were normal, and no motor disturbances or sensory abnormalities were noted, despite a tender midline lumbar spine. (T. 853-54 (12/18/08); 859 (9/25/08)). On March 25, 2009, Dr. Thibault found muscle aches, and pain localized to one or more

---

[12] In order to meet the listing, a finding of atrophy must be accompanied by specific measurements of the affected muscle(s). Listing of Impairments § 1.00(E)(1).

joints, but found no motor or sensory disturbances. (T. 850). On June 25, 2009, Dr. Thibault found no muscle aches, no localized joint pain or stiffness, no motor or sensory disturbances. (T. 841). On August 24, 2009, Dr. Thibault's nurse practitioner stated that plaintiff's overall musculoskeletal findings were normal, and plaintiff's gait and stance were normal. (T. 837). On August 31, 2009, September 21, 2009, and February 16, 2010, Dr. Thibault found no motor or sensory disturbances. (T. 824, 829, 833). On February 16, 2010, plaintiff also told Dr. Thibault that he was "exercising regularly." (T. 822).

On January 15, 2009, plaintiff was referred to Dr. Madonian for evaluation of his hernia by Dr. Thibault. (T. 771-72). Plaintiff reported myalgia and trouble walking, but Dr. Madonian found that plaintiff walked with a normal gait for his age, had full range of motion in all extremities, and had no neurological focal deficits. (T. 772). Although on December 23, 2009, Dr. Baird reported that plaintiff had some diminished reflexes (as plaintiff argued above) and some decreased sensation, plaintiff's straight leg raising test was negative, and "his motor seem[ed] to be intact." (T. 519). On March 26, 2010, even after plaintiff was found disabled, Dr. Michael Potter, M.D. reported that plaintiff had "mild pain" and normal range of motion with flexion and extension of his spine. (T. 785). On neurologic examination, plaintiff had full strength, 2+ knee and ankle jerks, and no clonus. Although his sensation was decreased over his S1 distribution on the left side and had low back pain with left leg straight leg raise, he "denie[d] radiculopathy with that." Straight leg raising was negative on the right, and the doctor did not indicate whether the straight leg raising

test was seated, supine or both as required by the listing.

The law is clear that in supporting her decision with substantial evidence, the ALJ cannot pick and choose only the parts of the record that support her determination, without affording consideration to the evidence supporting plaintiff's claim. *Credle v. Astrue*, No. 10-CV-5624, 2012 WL 4174889, at *17, 2012 U.S. Dist. LEXIS 134126 (E.D.N.Y. Sept. 19, 2012) (citing *Stewart v. Astrue*, No. 10-CV-3032, 2012 WL314867, 2012 U.S. Dist. LEXIS 12098 (E.D.N.Y. Feb. 1, 2012)). The ALJ considers data provided by physicians, but draws her own conclusions as to whether the data supports a finding of disability. *Id.* (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). To the extent that those reports are inconsistent, conflicts in the evidence are for the ALJ to resolve. *Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). The ALJ need not reconcile every shred of evidence in support of his decision. *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp. 2d 67, 78–79 (N.D.N.Y. 2005) (citations omitted). In this case, based on all the conflicting evidence, the ALJ's determination that plaintiff did not meet Listing 1.04(a) is supported by substantial evidence.

## C.    RFC/Treating Physician

Plaintiff argues that the ALJ did not properly weigh the medical evidence in the record, resulting in an RFC that is not supported by substantial evidence. This court does not agree and will consider these two arguments together.

### 1.    Legal Standards

#### a.    RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).

RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute his own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)), (*Report-Recommendation*), *adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v.*

*Comm'r of Soc. Sec.*, No. 6:00-CV-1225, at *3 (N.D.N.Y. Aug. 2, 2005)).  In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7.

### b.    Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  The ALJ must properly analyze the reasons that the report of the treating physician is rejected. *Halloran*, 362 F.3d at 32-33.

### 2.    Application

Plaintiff first argues that the ALJ erred in continuing to consider the opinion of Dr. Sinha, assigning the opinion "some weight," after being informed that Dr. Sinha had surrendered his medical license.  The defendant argues that Dr. Sinha had his medical license when he examined plaintiff, and even without Dr. Sinha's opinion, there was substantial evidence supporting the ALJ's determination.  This court does not consider the issue of whether Dr. Sinha's opinion should have been entitled to any

weight because he had his medical license when he examined plaintiff.[13]  The court finds only that there is substantial evidence in the record, considered by the ALJ that supports her finding regarding the plaintiff's disability.  Thus, any consideration of Dr. Sinha's opinion was at worst, harmless error because the ALJ properly considered all the other evidence of record to determine that plaintiff still possessed the ability to perform substantial gainful activity until he was found disabled, beginning March 2010. *See Zabala v. Astrue*, 595 F.3d 402, 409-410 (2d Cir. 2010) (finding that remand is unnecessary, notwithstanding a legal error, where the application of correct legal principles to the record could lead only to the same conclusion).

Plaintiff also argues that the ALJ erred in giving little weight to Dr. Huang's RFC evaluation.  In support of plaintiff's original application, Dr. Huang submitted a very restrictive RFC evaluation. (T. 780-82).  Dr. Huang found, *inter alia*, that plaintiff could only stand for five minutes, could only walk one half mile with rest, and could only sit for a "cpl" of hours. (T. 781).  However, in Dr. Huang's September 16, 2009 report, he stated that "[plaintiff] had some disability paperwork for us to fill out. We had to go by his history since it seems like he will be unable to obtain a functional capacity evaluation so we had to just make a gross estimate based on his history." (T. 464).  The AC remanded this case to the ALJ, in part, to contact Dr. Huang, plaintiff's treating physician to request a clarification of this statement. (T. 621).

---

[13] The court notes that, according to his affidavit, Dr. Sinha surrendered his license, in part, because he was not examining patients properly. (T. 760-70).

On remand, plaintiff's attorney contacted Dr. Huang, who responded with a letter, dated February 1, 2010, stating that "[r]egarding Corey Hollenbeck's ability to work, I would defer to a functional capacity evaluation." (T. 516). On November 3, 2011, plaintiff's counsel wrote another letter to Dr. Huang, explaining the situation and requesting further clarification of his cryptic statements, particularly based upon the understanding that Dr. Huang's office does not complete RFC forms. (T. 783-84). Dr. Huang did not respond to the November 3, 2011 letter. (T. 550).

In her latest decision, the ALJ stated that because Dr. Huang did not identify the basis for the limitations expressed in the RFC, even after two requests to do so, the ALJ re-examined Dr. Huang's contemporaneous examination notes to determine if they were consistent with the RFC evaluation. (T. 550). The ALJ then determined that based upon the findings in Dr. Huang's contemporaneous reports, there was no indication that plaintiff could only stand for only five minutes, sit for only a "cpl" hours, walk half a mile with rest, do no climbing, and lift and carry only 10 pounds. The contemporaneous reports showed that plaintiff was never in acute distress, straight leg raising was often negative, with some minor exceptions, and although there was some sensory loss and some pain, plaintiff's gait was normal. Thus, the ALJ properly gave Dr. Huang's RFC evaluation "limited evidentiary weight."

In addition, the ALJ analyzed the other medical reports of record, including one by Dr. Moehs, who evaluated plaintiff for the Department of Social Services and found that plaintiff could essentially perform light work. (T. 551). The ALJ allocated "some weight" to the report, given that Dr. Moehs only examined plaintiff once.

Plaintiff told Dr. Madonian in January of 2009 that he had been shoveling, and Dr. Madonian, advised that the plaintiff should avoid *lifting heavy objects or shoveling*. (T. 551). The activity of shoveling as late as January of 2009, almost two years after plaintiff claims to have been disabled, clearly is inconsistent with Dr. Huang's restrictive assessment. The ALJ gave "some weight" to Dr. Madonian's report. The ALJ, thus, supported her rejection of Dr. Huang's restrictive RFC with substantial evidence.

Plaintiff also argues that the ALJ failed to comply with the AC's remand in analyzing Dr. Camillo's and Dr. Apacible's opinions regarding plaintiff's mental abilities.[14] Dr. Camillo is plaintiff's treating psychiatrist. In the ALJ's original opinion, she stated that she was giving great weight to Dr. Camillo's opinion, but failed to explain why Dr. Camillo's opinion would support plaintiff's ability to sustain work, given certain "moderate limitations." (T. 621). On remand, the ALJ stated that although Dr. Camillo stated the plaintiff had "moderate" limitations in some areas, including following complex instructions or interacting appropriately with supervisors and co-workers, the ALJ interpreted a "moderate" limitation as more than slight, but still allowing the individual to function "satisfactorily." (T. 552). This is the specific

---

[14] Plaintiff argues that the ALJ has again found that plaintiff's mental impairment did not "limit him." (Pl.'s Br. at 19). However, the ALJ did not make this finding. The ALJ specifically stated that plaintiff's limitations would not prevent him from working. This is different than saying that plaintiff mental health does not "limit" him. The ALJ recognized that Dr. Camillo found "moderate" limitations in some areas. (T. 552). Although plaintiff's brief argues that the Commissioner failed to properly apply the required steps in the special technique required for evaluating mental impairments, plaintiff focuses on the "mild" versus "moderate" restrictions and their effect on plaintiff's mental RFC.

definition from the form completed by Dr. Camillo. (T. 459).

Dr. M. Apacible is a state agency non-examining medical consultant. (T. 337-40). Dr. Apacible found that plaintiff was not significantly limited in his ability to remember locations and work-like procedures and to understand and remember very short and simple instructions. (T. 337). Plaintiff was moderately limited in his ability to understand and remember detailed instructions, but was not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, sustain an ordinary routine, and work in coordination with or in proximity to other people without being distracted by them. (T. 337).

While plaintiff was moderately limited in some areas, such as doing more complex work, maintaining attention for extended periods or completing a normal work day or week without interruptions due to psychological symptoms, the ALJ correctly analyzed and interpreted the term "moderate" as not preventing plaintiff from all work. The ALJ also pointed out that while plaintiff did have some "moderate" difficulties, Dr. Apacible found no significant limitations in fourteen out of twenty-one functional areas. (T. 337-40, 552). This evaluation was consistent with Dr. Camillo and with Dr. Shapiro's evaluations.

While plaintiff argues that the ALJ "refused to acknowledge" that plaintiff's mental health condition had any effect on his ability to work, this court does not interpret the ALJ's decision in that manner. The ALJ stated that in addition to the *moderate* limitations, plaintiff only had "*mild*" limitations for understanding, remembering and carrying out "simple" instructions, making simple work-related

decisions and in dealing with the public. (*Id.*)  The ALJ interpreted Dr. Camillo's report to state that while plaintiff had some difficulties with complex work, he did retain the ability to frequently meet the demands of "basic mental work." (T. 552).  In accordance with the remand, the ALJ then re-analyzed Dr. Kimball's GAF scores, making it clear that the lower scores were not consistent and would not prevent plaintiff from working. (T. 553).

The ALJ found that plaintiff could physically perform light and sedentary work.  Plaintiff argues that the ALJ did not properly reassess plaintiff's RFC because she continued to find that plaintiff could perform light work.  The fact that the Appeals Council directed the ALJ to reassess plaintiff's RFC does not mean that the ALJ could not properly assess plaintiff's RFC, and arrive at the same conclusion.

Plaintiff argues that the ALJ did not take into account the fact that plaintiff must alternate sitting and standing.  However, as this court has found above, the ALJ properly rejected the restrictive RFC from Dr. Huang because it was neither supported by the evidence in the record, nor by Dr. Huang's own statements that he "deferred" to a functional capacity evaluation and then declined to elaborate upon his findings.  Instead, the ALJ gave some weight to Dr. Moehs's report, finding that, during the time in question, plaintiff would not have any restrictions on sitting and would be able to stand and/or walk for at least two hours in an eight-hour work day. (T. 551).  The ALJ gave limited weight to Dr. Moehs's finding that plaintiff could only work a six-hour day because this determination was not supported by the evidence of record "and appears to be an outlier when compared to the other opinions he rendered." (*Id.*)

The court notes that on September 24, 2009, Dr. Moehs completed a Functional Capacity Evaluation in which he circled "Light" for plaintiff's range of physical exertion. (T. 512). Under the heading "Light" it indicates lifting 20 pounds occasionally and 10 pounds frequently. It also indicates that standing or walking could be performed "6hrs/day min.," and there were no limitations on sitting. (T. 512). The entire list was circled by Dr. Moehs. The document further states that although plaintiff's ability to bend, stoop, crouch, and squat were "abnormal," his ability to remain seated for "long periods" was "normal," as were his abilities to climb, grasp, tolerate fumes or extremes of temperature, tolerate exposure to heights or machinery, and operate a motor vehicle. (*Id.*) With respect to mental demands, Dr. Moehs rated all plaintiff's abilities as "normal," including understanding, carrying out, and remembering instructions, responding appropriately to co-workers and supervision, meeting quality standards and production norms, and sustaining adequate attendance. (*Id.*)

Plaintiff again argues that the ALJ chose only evidence that did not favor plaintiff's case. This argument is applicable to cases in which the ALJ selected portions of a physician's report, while *ignoring* other portions of the report to the plaintiff's disadvantage.[15] The ALJ in this case did not fail to consider evidence from

---

[15] *See also Menard v. Astrue*, No. 2:11-CV-42, 2012 WL 703871, at *6 (D. Vt. Feb. 14, 2012) (the ALJ cited doctor's note that plaintiff was "'busy doing yard work and things around the house,'" but failed to mention that in the same report, the doctor noted that plaintiff was "feeling crappy;" that his shoulder hurt; he was getting tingling in his fingers; his hands felt stiff; and his hands had been uncontrollably jerking up in the air); *Rich v. Comm'r of Soc. Sec.*, No. 2:11-CV-85, 2012 WL 209030, at *5 (D. Vt. Jan. 24, 2012) (ALJ gave weight only to statement that plaintiff was progressing toward her goals, without considering that there were other treatment notes describing

33

Dr. Moehs's opinion that supported plaintiff's claim, rather, she explained the reasons why she found that, to the extent Dr. Moehs implied that plaintiff could not work a full day, this finding was not supported by the record as a whole. (T. 551).

This court agrees. A review of Dr. Moehs's September 24, 2009 findings indicates that they are internally inconsistent when he states that plaintiff can perform sedentary work for 2-4 hours per day, but in the next two sentences, he states that plaintiff could sit for 6 hours per day. (T. 510). In the form that Dr. Moehs completes, he writes that plaintiff can climb and stand "intermittently," but that plaintiff has no restriction on sitting or walking. (T. 508). The report is more consistent with the form Dr. Moehs signed on September 24, 2009, where the "6 hours" referred to 6 hours "minimum."

While in both documents, Dr. Moehs states that plaintiff can only stoop and bend four times per day, on October 26, 2009, plaintiff told the psychologist who was reviewing plaintiff's mental status for the Jefferson County Department of Social Services that he "daily" worked on his cars. (T. 507). Working on a car generally involves quite a bit of bending over, depending on the work being done. The psychologist noted that plaintiff should avoid heavy lifting. (*Id.*) The ALJ noted that the signature on this document is illegible. (T. 551). However, the ALJ stated that the psychologist's statement is consistent with the "conservative treatment" that plaintiff has pursued for his musculoskeletal problems. (*Id.*)

As stated above, the ALJ properly rejected Dr. Huang's restrictive RFC

---

severe symptoms).

assessment and then properly accorded weight to the other evidence of record in determining that during the period in question, plaintiff had the RFC for light and sedentary work.

### D. Vocational Expert/Hypothetical Question

#### 1. Legal Standard

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566, 416.966.  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is questioned using a hypothetical question that incorporates plaintiff's limitations.  Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F.Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion."  *Dumas*, 712 F.2d at 1554. *See also Peatman v. Astrue*,

No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

### 2. Application

Plaintiff argues that because the ALJ's RFC was improperly determined, the hypothetical question to the VE omitted important limitations that would further reduce the amount of jobs available to plaintiff. At the hearing, the ALJ asked VE to assume that plaintiff was a young individual, between 33 and 38 years old, with a limited education and no past relevant work. (T. 589). There is no dispute over these facts.

Next, the ALJ stated that the plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently, sit without restrictions, stand or walk at least two hours in an eight-hour day, push or pull 20 pounds occasionally and 10 pounds frequently. (T. 589-90). Although plaintiff takes issue with these findings, as this court has found above, these specific functions are supported by substantial evidence. There were no postural, manipulative, or environmental limitations *except* that plaintiff could only climb, stand, stoop or bend occasionally. Once again, as stated above, the ALJ supported these findings with substantial evidence by distinguishing the reports or parts of reports that contradicted the findings, and giving them less weight, particularly in view of plaintiff's own stated activities during the period in question, including shoveling snow and working on cars.

With respect to plaintiff's mental capabilities, the ALJ specifically noted that plaintiff had mild restrictions in some areas, but emphasized that the plaintiff had moderate restrictions in others. (T. 590). Although the ALJ did not use the word "moderate," she used the definition of moderate restriction that was on the form completed by the physician: "I just want to emphasize that there are limitations in those areas of interacting appropriately with supervision, co-workers, usual work situations and dealing with routine work changes. *There are limitations, but those abilities are not precluded.*" (T. 590) (emphasis added). In response, the VE identified the jobs in the "light" category of mail room clerk, cafeteria attendant, and parking lot attendant. (T. 590-91).

The ALJ also asked the VE to name jobs in the sedentary category that a person with plaintiff's physical and mental limitations could perform. (T. 591). The VE mentioned various occupations, including charge account clerk and eyeglass frame polisher. (T. 593). The VE stated that those were the only two for someone in the plaintiff's "situation." (T. 593). The VE stated that the "problem" in this exertional category was that most sedentary jobs required "a little more skill" than plaintiff had, and those jobs might be "problematic" for an individual with even "slight" limitations in dealing with customers. (T. 593). Thus, the VE could only name two jobs in this category that plaintiff could perform, and one of the jobs did not exist in the plaintiff's local economy. (T. 593).

Plaintiff's counsel asked the VE to assume that, in addition to the limitations proposed by the ALJ in the first hypothetical, the plaintiff would be "off task" at

"unscheduled times" for ten minutes each time and four times per day or might lose his temper with a supervisor or a co-worker. (T. 593-94). The VE testified that if plaintiff's additional limitations were considered, there would be no work that plaintiff could perform in either the light or the sedentary category. (T. 594).

Based on the above answer from the VE to plaintiff's counsel, plaintiff argues that the ALJ misapplied Step Five of the disability analysis, by finding that plaintiff could return to various jobs in the national economy. Once again, because this court has found the ALJ's assessment of plaintiff's RFC was supported by substantial evidence, plaintiff's argument must fail. The ALJ properly found that plaintiff's hypothetical question, asking the VE to assume that plaintiff would be "off-task" for a certain amount of time per day was contradicted by other evidence.[16] (T. 557).

While there were not many jobs cited by the VE, what constitutes a "significant number" is "fairly minimal." *Rosa v. Colvin*, No. 3:12-CV-170, 2013 WL 1292145, at *9 (N.D.N.Y. March 27, 2013) (citing *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009)). In the light work category, the mail room clerk had 12,240 in New York State and 130 jobs in plaintiff's region. (T. 590-91). There were 390,020 cafeteria attendant positions in New York and 280 in plaintiff's region. (T. 591). There were 16,930 parking lot attendant positions in New York State and 120 in plaintiff's region of Northern New York. (T. 591). The VE mentioned others, but even the three mentioned above exist in sufficient numbers to

---

[16] *See Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009) (when the ALJ did not err discounting the treating physician, neither did he err in failing to include those limitations in the hypothetical question posed to the expert).

be significant. *See Glover v. Astrue*, No. 10-CV-8942, 2013 WL 64428, at *14 (S.D.N.Y. Jan. 2, 2013) (citing *inter alia Dumas v. Schweiker*, 712 F.2d 1545, 1549 (2d Cir. 1983) (finding that a time clerk position with 150 jobs in the region and 112,000 nationally was "significant")).

### E.  Credibility

#### 1.  Legal Standard

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.

*Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

### 2.    Application

Although plaintiff does not argue that the ALJ erred in discounting his credibility, the ALJ rejected plaintiff's allegations, to the extent that plaintiff claimed that he was extremely limited. (T. 555). The ALJ noted that the plaintiff had maintained a broad range of activities of daily living, including fixing meals, attending to personal needs, and doing housework. In December of 2007, he reported hobbies such as talking on the computer and working on cars. In January of 2009, he reported to one of his physicians that he was shoveling snow. In February of 2010, plaintiff reported "exercising regularly." (*Id.*). In March of 2010, he reported doing odd jobs, and in April of 2010, notwithstanding a finding of disability, he reported helping his landlord around the building. (*Id.*). The ALJ noted plaintiff's criminal history and

poor work history, both of which do not "bolster" plaintiff's credibility and reflect poorly on plaintiff's motivation to work. (T. 556). Thus, the ALJ's determination that plaintiff was not disabled for the closed period from August 23, 2007 until March 15, 2010 is supported by substantial evidence, notwithstanding contrary claims by plaintiff.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 20, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge